IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

Jon Lindler,                               )      Civil Action No. 8:13-cv-2007-MGL-JDA
                    Plaintiff,             )
                                           )
        vs.                                )      **REPORT AND RECOMMENDATION**
                                           )      **OF MAGISTRATE JUDGE**
Carolyn W. Colvin,                         )
Commissioner of Social Security,           )
                                           )
                    Defendant.             )

        This matter is before the Court for a Report and Recommendation pursuant to 28

U.S.C. § 636(b)(1)(B) Local Rule 73.02(B)(2)(a), D.S.C.[1]   Plaintiff brought this action

pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision

of the Commissioner of Social Security ("the Commissioner"), denying Plaintiff's claims for

disability insurance benefits ("DIB") and supplemental security income ("SSI").[2]   For the

reasons set forth below, it is recommended that the decision of the Commissioner be

affirmed.

## PROCEDURAL HISTORY

        Plaintiff previously filed an application for DIB and SSI on September 18, 2006. [R.

13.] The application was denied in a decision dated June 25, 2009.  [*Id.*, R. 66–80).] The

prior claim was denied on the basis that alcoholism was material to the decision of

---

        [1]A Report and Recommendation is being filed in this case, in which one or both parties
declined to consent to disposition by a magistrate judge.

        [2] Section 1383(c)(3) provides, "The final determination of the Commissioner of Social
Security after a hearing under paragraph (1) shall be subject to judicial review as provided
in section 405(g) of this title to the same extent as the Commissioner's final determinations
under section 405 of this title."  42 U.S.C. § 1383(c)(3).

disability.  [R. 13.]  Under the doctrine of res judicata, the previous decision is final and binding insofar as it relates to the period on and before June 25, 2009, pursuant to the provisions of 20 C.F.R. §§ 404.957 and 416.1457.  [R. 13, *see also Peugeot Motors of Am., Inc. v. E. Auto Distribs., Inc.*, 892 F.2d 355, 359 (4th Cir. 1989) ("[n]ot only does res judicata bar claims that were raised and fully litigated, it prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding").]  The ALJ determined that there has been no new and material evidence presented with regard to that time period which would warrant reopening of the prior decision, and the new evidence presented shows the claimant's alcoholism continued until about one month after the prior decision. [R. 13.]

On May 20, 2010, Plaintiff filed applications for DIB and SSI alleging an onset of disability date of June 23, 2009.  [R. 147–53, 156–59.]  Plaintiff's claims were denied initially and upon reconsideration by the Social Security Administration ("the Administration").  [R. 117–21, 123–28]   Plaintiff requested a hearing before an administrative law judge ("ALJ") and on September 26, 2012, ALJ Ivar E. Avots conducted a de novo hearing on Plaintiff's claims.  [R. 31–62.]

The ALJ issued a decision on December 12, 2012, finding Plaintiff not disabled under the Social Security Act ("the Act").  [R. 13–25.]  At Step 1,[3] the ALJ found Plaintiff met the insured status requirements of the Act through December 31, 2010, and he had not engaged in substantial gainful activity since June 23, 2009, the alleged onset date.  [R. 15, Findings 1 & 2.]   At Step 2, the ALJ found Plaintiff had severe impairments of:

---

[3]The five-step sequential analysis used to evaluate disability claims is discussed in the Applicable Law section, *infra*.

depression, anxiety, personality disorder, and residuals of a gunshot wound to the left leg [R. 16, Finding 3.] At Step 3, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled the criteria of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. 16, Finding 4.] The ALJ specifically considered Listings 1.06, 12.04, 12.06, and 12.08. [R. 16.] Before addressing Step 4, Plaintiff's ability to perform her past relevant work, the ALJ found Plaintiff retained the following residual functional capacity ("RFC"):

> I find that the claimant has the residual functional capacity to perform a range of medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except for limitations to lifting 50 pounds occasionally and 25 pounds frequently; sitting, standing, and walking about 6 hours each in an eight-hour workday; pushing and pulling frequently with the left lower extremity but not continually; and occasionally climbing and stooping. He can frequently perform all other postural activities. He should also avoid concentrated exposure to hazards such as unprotected heights and dangerous machinery. Mentally, he could concentrate, persist, and work at pace to do simple, routine, repetitive tasks at SVP levels of 1 and 2 for 2-hour periods in an eight-hour workday, interact occasionally with the public, and interact appropriately with coworkers and supervisors in a stable, routine setting.

[R. 20, Finding 5.] Based on this RFC, at Step 4, the ALJ determined Plaintiff was unable to perform his past relevant work as a maintenance man, electrician, or electrician's helper. [R. 23, Finding 6.] Considering Plaintiff's age, education, work experience, and RFC, however, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. [R. 23, Finding 10.] Accordingly, the ALJ concluded Plaintiff has not been under a disability, as defined by the Act, from June 26, 2009 through the date of the decision. [R. 24–25, Finding 11.]

Plaintiff requested Appeals Council review of the ALJ's decision, and the Council declined review.  [R. 1–6.]  Plaintiff filed this action for judicial review on July 22, 2013. [Doc. 1.]

## THE PARTIES' POSITIONS

Plaintiff contends the ALJ's decision is not supported by substantial evidence and claims the ALJ erred by failing to give controlling weight to the opinion of Dr. Caleb Loring ("Dr. Loring") who found limitations that, according to the vocational expert ("VE"), would dictate a finding that Plaintiff was disabled.  [Doc. 15 at 22.]  Plaintiff contends Dr. Loring was the only physician to provide an opinion after Plaintiff's condition worsened and, thus, was entitled to controlling weight.  [*Id.* at 22–28.]  Plaintiff further contends the ALJ improperly rejected Dr. Loring's opinion base on logically or legally insufficient reasoning and gave more weight to irrelevant opinions in this case.  [*Id.* at 28–37.]

The Commissioner, on the other hand, contends the ALJ's decision is supported by substantial evidence because the ALJ properly found that  Dr. Loring's opinion was unsupported by the vast majority of the relevant evidence of record.  [Doc. 16 at 11–12.] Further, the Commissioner contends that Plaintiff's one-time, exacerbation of his symptoms near the end of April 2012 did not invalidate all prior evidence and opinions.  [*Id.* at 13–16.] The Commissioner asserts the ALJ provided well-supported reasons for affording limited weight to Dr. Loring's October 2012 opinion and giving more weight to the state agency medical opinions.  [*Id.* at 16–25.]

4

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963)) ("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court.  *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision).  Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence.

5

*See Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012); *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano,* 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).    Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'"    *Vitek v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)).    Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose."    *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g).    *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision).    To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim.    *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court

6

to find the claimant disabled). Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four is usually the proper course to allow the Commissioner to explain the basis for the decision or for additional investigation. *See Radford v. Comm'r*, 734 F.3d 288, 295 (4th Cir. 2013) (quoting *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *see also Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand."). After a remand under sentence four, the court enters a final and immediately appealable judgment and then loses jurisdiction. *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g). A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's

7

failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[4]  With remand under sentence six, the parties must return to the court after remand to file modified findings of fact. *Melkonyan*, 501 U.S. at 98.  The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings.  *See Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C. § 405(g) is not a final order).

## APPLICABLE LAW

---

[4]Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence.  *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152, 2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107, 2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992).  Further, the Supreme Court of the United States has not suggested *Borders*' construction of § 405(g) is incorrect.  *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990).  Accordingly, the Court will apply the more stringent *Borders* inquiry.

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a disability.  42 U.S.C. § 423(a).  "Disability" is defined as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

## I.     The Five Step Evaluation

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims).  The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. Through the fourth step, the burden of production and proof is on the claimant.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).  The claimant must prove disability on or before the last day of her insured status to receive disability benefits.  *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969).  If the inquiry reaches step five,

the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience. *Grant*, 699 F.2d at 191. If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary. 20 C.F.R. §§ 404.1520(a), 416.920(a)(4); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A.     *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. §§ 404.1572(a), 416.972(a)—and gainful—done for pay or profit, whether or not a profit is realized, *id.* §§ 404.1572(b), 416.972(b). If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity. *Id.* §§ 404.1574–.1575, 416.974–.975.

### B.     *Severe Impairment*

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. *See id.* §§ 404.1521, 416.921. When determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G). The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses. *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined

10

effect of a claimant's impairments and not fragmentize them").  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments.").  If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process."  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

### C.     *Meets or Equals an Impairment Listed in the Listings of Impairments*

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. §§ 404.1509 or 416.909, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience.[5]  20 C.F.R. §§ 404.1520(d), 416.920(a)(4)(iii), (d).

### D.     *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant."  *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995).  At this step of the evaluation, the ALJ compares the claimant's residual functional capacity[6] with the physical and mental demands of the kind

---

[5]The Listing of Impairments is applicable to SSI claims pursuant to 20 C.F.R. §§ 416.911, 416.925.

[6]Residual functional capacity is "the most [a claimant] can still do despite [his] limitations."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

of work he has done in the past to determine whether the claimant has the residual functional capacity to do his past work.  20 C.F.R. §§ 404.1560(b), 416.960(b).

### E.     *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *See* 20 C.F.R. §§ 404.1520(f)–(g), 416.920(f)–(g); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992).  To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids").  Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant nonexertional factors.[7]  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving exertional limitations).  When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines.  *Gory*, 712 F.2d at 931.  In such a case, the Commissioner must use a VE to establish the claimant's ability to perform other work.  20 C.F.R. §§ 404.1569a, 416.969a; *see Walker*, 889 F.2d at 49–50 ("Because we have found that the grids cannot be relied upon to show conclusively that claimant is not

---

[7]An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs. 20 C.F.R. §§ 404.1569a(a), 416.969a(a).  A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands.  *Id.*  Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing.  20 C.F.R. §§ 404.1569a(c)(1), 416.969a(c)(1).

disabled, when the case is remanded it will be incumbent upon the [Commissioner] to prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy.").  The purpose of using a VE is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform." *Walker*, 889 F.2d at 50.  For the VE's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Id.* (citations omitted).

## II.    Developing the Record

The ALJ has a duty to fully and fairly develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  The ALJ is required to inquire fully into each relevant issue. *Snyder*, 307 F.2d at 520.  The performance of this duty is particularly important when a claimant appears without counsel. *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980).  In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Id.* (internal quotations and citations omitted).

### III.    Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion, 20 C.F.R. §§ 404.1527©, 416.927©.  Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because

14

"it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).   An ALJ determination coming down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways.  *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986).  Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  20 C.F.R. §§ 404.1527(d), 416.927(d).  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  *Id.*

## IV.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. §§ 404.1517, 416.917; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986).   The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability.  20 C.F.R. §§ 404.1517, 416.917.  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  *Id.*

## V.    Pain

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing

15

the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). In evaluating claims of disabling pain, the ALJ must proceed in a two-part analysis. *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished opinion). First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'" *Id.* (quoting *Craig*, 76 F.3d at 594). Second, "if, and only if, the ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain." *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the "pain rule" applicable within the United States Court of Appeals for the Fourth Circuit, it is well established that "subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs." *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. §§ 404.1528, 416.928. Indeed, the Fourth Circuit has rejected a rule which would require the claimant to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all administrative law judges

16

within the circuit a policy stating Fourth Circuit law on the subject of pain as a disabling

condition, *Hyatt v. Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990).  The Commissioner

thereafter issued the following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth Circuit (North Carolina, South Carolina, Maryland, Virginia and West Virginia), Social Security Ruling (SSR) 88-13, Titles II and XVI: Evaluation of Pain and Other Symptoms:
>
> ...
>
> **FOURTH CIRCUIT STANDARD:** Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence.  If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability.  Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered.  Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990).  SSR 90-1p has since been

superseded by SSR 96-7p, which is consistent with SSR 90-1p.  *See* SSR 96-7p, 61 Fed.

Reg. 34,483-01 (July 2, 1996).  SSR 96-7p provides, "If an individual's statements about

pain or other symptoms are not substantiated by the objective medical evidence, the

adjudicator must consider all of the evidence in the case record, including any statements

by the individual and other persons concerning the individual's symptoms."  *Id.* at 34,485;

*see also* 20 C.F.R. §§ 404.1529(c)(1)–(c)(2), 416.929(c)(1)–(c)(2) (outlining evaluation of pain).

## VI.    Credibility

The ALJ must make a credibility determination based upon all the evidence in the record.  Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985). Although credibility determinations are generally left to the ALJ's discretion, such determinations should not be sustained if they are based on improper criteria.  *Breeden*, 493 F.2d at 1010 ("We recognize that the administrative law judge has the unique advantage of having heard the testimony firsthand, and ordinarily we may not disturb credibility findings that are based on a witness's demeanor.  But administrative findings based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

## APPLICATION AND ANALYSIS

**Treating Physician Opinions**

Plaintiff's alleges the ALJ's erred in his weighing of Dr. Loring's opinion.  [Doc. 15 at 25.]  Plaintiff argues the other physicians' conclusions were based on medical records generated well before Plaintiff's condition critically worsened which made their opinions irrelevant.  [*Id.* at 23.]  Plaintiff takes issue with the ALJ's decision to "reject" Dr. Loring's opinion because he examined Plaintiff only one time.  [*Id.* at 28.]  Further, Plaintiff takes issue with the ALJ's assigning significant weight to non-examining sources whose opinions

18

were based on incomplete or partially complete medical records, in light of Plaintiff's assertion that, starting in early 2011, his condition worsened for a period well in excess of a year. [*Id.* at 29–34.]

The Commissioner contends the ALJ properly found the impact of Plaintiff's impairments, though significantly limiting, do not preclude all work activity, by relying on the records from Plaintiff's long-time treating medical sources, Dr. Alvin J. Ratzlaff ("Dr. Ratzlaff") and Dr. Thomas F. Bradberry ("Dr. Bradberry"), and the medical opinion of a non-examining State-agency medical source, Dr. Horn. [Doc. 16 at 10.] The Commissioner argues Plaintiff's short symptom exacerbation in mid-2012 was treated quickly and effectively by adjusting his medications, and the ALJ did not abuse his discretion in finding that Dr. Loring's opinion is unsupported by the vast majority of the relevant evidence of record. [*Id.* at 11.] The Court agrees with the Commissioner.

The ALJ is obligated to evaluate and weigh medical opinions "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). Courts typically "accord 'greater weight to the testimony of a treating physician' because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Id.* (*quoting Mastro*, 270 F.3d at 178). While the ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, *Craig*, 76 F.3d at 590, the ALJ must still weigh the medical opinion based on the factors listed in 20 C.F.R. §§ 404.1527©, 416.927©..

19

The opinion of a treating physician is given controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  Additionally, SSR 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

1996 WL 374188, at *4 (July 2, 1996).  However, not every opinion offered by a treating source is entitled to deference:

> Medical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is "disabled" or "unable to work," or make similar statements of opinions.  In addition, they sometimes offer opinions in other work-related terms; for example, about an individual's ability to do past relevant work or any other type of work.  Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner.  Such opinions on these issues must not be disregarded.  However, even when offered by a treating source, they can never be entitled to controlling weight or given special significance.

SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see also* 20 C.F.R. §§ 404.1527(e), 416.927(e) (stating an ALJ does not have to "give any special significance to the source of an opinion on issues reserved to the Commissioner," such as an opinion that the claimant

20

is disabled, the claimant's impairment or impairments meets or equals a listing, or the claimant has a certain residual functional capacity); *Mastro*, 270 F.3d at 178 (stating that "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight") (internal quotation marks and citation omitted); *Craig*, 76 F.3d at 589 (defining "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance" and stating that the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]"); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972) (holding that regardless of whether the court agrees or disagrees with the Commissioner's decision, the court must uphold it if it is supported by substantial evidence).

### Dr. Loring's Opinion

In September 2012, Plaintiff's attorney referred him to Dr. Loring for a psychological assessment to determine the extent to which Plaintiff was "currently experiencing psychological problems." [R. 443.] In his initial observations, Dr. Loring indicated Plaintiff arrived on time, completed all paperwork independently, and was pleasant and cooperative throughout the interview and assessment. [*Id.*] Plaintiff reported to Dr. Loring that he was applying for disability due to "depression and some suicidal thoughts" as well as pain from the gunshot wound he suffered to his left leg.[8] [*Id.*] Dr. Loring administered the M-FAST

---

[8]Plaintiff was injured by a rifle wound to the upper left leg when he was 16 years old. [R. 294.] He continued to work but was described as being "disabled in the left leg with complications [from a] gunshot wound in that leg and arthritis in the right knee." [*Id.*] He was also diagnosed with chronic pain syndrome. [R. 293.] Plaintiff was able to start

Test of Malingering and found the results suggested Plaintiff was presenting himself in an authentic manner and did not appear to be promoting or exaggerating symptoms. [*Id.*]

Socially, Plaintiff reported attending church and interacting with church members on Wednesdays and Sundays. [R. 444.] Otherwise, Plaintiff stated he did not have many significant social contacts. [*Id.*] From a medical standpoint, Plaintiff reported that his depressive symptoms began in 2003 when he and his wife divorced. [*Id.*] He reported sleeping roughly four hours per night, being hyperemotional and upset by "random things," and crying in church. [*Id.*] Plaintiff reported taking Effexor XR, Abilify, and Valium since 2006 and stated his medications had helped him. [*Id.*] Plaintiff explained that his anxiety and depression increased if he did not take his medications. [*Id.*] Plaintiff reported being hospitalized in 2006, 2008, 2009 and 2012 for suicidal thoughts. [*Id.*] Dr. Loring noted that, on some medical records provided to him, Plaintiff was diagnosed with depressive disorder, personality disorder, and some type of bipolar disorder, potentially in the past. [*Id.*] Dr. Loring noted the most recent medical record provided to him was from January 2011 and appeared to be a medication update with no significant clinical data. [R. 444–45.]

With respect to the mental status exam, Dr. Loring indicated Plaintiff's behavior was unremarkable, although he noted Plaintiff moved slowly and appeared to be in mild pain. [R. 445.] Dr. Loring's notes describe Plaintiff's mood as "depressed" and his affect as flat and blunted; however, his speech was within normal limits, and his thought process and content was undisturbed. [*Id.*] Cognitively, Plaintiff was alert and oriented, able to quickly complete the serial 7's task presented to him, able to recall two out of three unrelated words

---

walking again without a cane about six months after his accident, however, his leg began to bother him more in the late 1990s and he started on narcotics in 2001. [R. 313.]

after a brief dely, and his insight and judgment appeared to be fair. [*Id.*] Intellectually, Dr. Loring noted Plaintiff appeared to be fairly bright and concluded that he was probably functioning in at least the average range. [*Id.*]

Dr. Loring noted the results of the MMPI-II test, used to assess and diagnose mental illness, indicated Plaintiff has a profile of psychological maladjustment characterized by overwhelming anxiety, tension, and depression. [*Id.*] Dr. Loring concluded Plaintiff attempted to control his worries through intellectualization and unproductive self-analysis but had difficulty concentrating and making decisions. [*Id.*] Dr. Loring concluded that Plaintiff was functioning at a very low level of efficiency, tended to overreact to even minor stress, and had the potential for rapid behavioral deterioration. [R. 446.] Dr. Loring described Plaintiff's lifestyle as chaotic and disorganized and surmised that Plaintiff had a history of poor work and achievement. [*Id.*] Dr. Loring opined that Plaintiff was preoccupied with obscure religious ideas, showed a meager capacity to experience pleasure in life, tended to be pessimistic, and viewed the world in a highly negative manner. [*Id.*] Dr. Loring opined that Plaintiff's personal relationships were characterized by a lack of basic social skills and that Plaintiff appeared to be insecure, lacked confidence, and became extremely anxious around other people. [*Id.*] Dr. Loring also noted Plaintiff's personality characteristics related to social introversion tended to be stable over time. [*Id.*] However, Dr. Loring stated that people with Plaintiff's profile were not good candidates for therapy and present a clear suicide risk. [*Id.*]

Dr. Loring opined

> Mr. Lindler presents as an individual capable of engaging in some self-sustaining activities of daily living. He appears to be experiencing some fairly significant depression at this time that

23

has led him to become reclusive and avoidant.  His depression appears to be severe in nature.  Despite Mr. Lindler seeking out treatment for years he has had repeated hospitalizations for suicidal ideation.  It would seem as though many of the issues he is dealing with are chronic in nature, as indicated on the MMPI-II results which are consistent with his history.  Mr. Lindler obviously has some fairly significant social problems and has had some issues with substance abuse in the past.  He reported that he is sober, which appears to be an authentic claim.

Due to his odd presentation and personality characteristics, should he become employed in the future it would be best for him to work at a job with limited public contact.  It seems as though Mr. Lindler would probably have a significantly difficult time even working with supervisors or co-workers in a vocational setting.

Of primary concern, however, is Mr. Lindler's apparent poor stress tolerance.  It seems as though if he was presented with any sort of stressful vocational situation the potential for him to decompensate psychologically and behaviorally would be significant.   While he would probably not harm others, he appears to be a potential suicide risk.  While not actively suicidal at the time of this assessment, it would seem as though if he were placed in a stressful situation these issues could certainly arise for him, as they have in the past.

Mr. Lindler's unstable psychological state of mind would make it difficult for him to work at an adequate pace with persistence in a full-time vocational setting.  He would have a difficult time complying with a schedule of set vacation time and break times in a typical workday.  He would probably require more time off and would probably have frequent absences from work.

Intellectually, he appears to be quite bright and would seem to be somebody capable of learning complex tasks.  His primary problems appear to be in the realms of emotional stability and social interactions.  Should he awarded funds in the future, he should probably receive some assistance in managing these funds given his history of substance abuse.

[R. 447.]  Dr. Loring diagnosed Plaintiff with Major Depressive Disorder, recurrent, severe

without psychotic features; anxiety disorder NOS; alcohol abuse, currently in remission per

claimant's report; avoidant or schizoid personality characteristics; and with pain from gunshot wound. [*Id.*] Dr. Loring assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 35.[9] [*Id.*]

In a Medical Assessment of Ability to Sustain Work-Related Activities (Mental) dated October 2010, Dr. Loring opined that, with respect to his ability to make occupational adjustments,

* Plaintiff could follow rules 80% of an 8-hour work day at a satisfactory level
* Plaintiff could relate to co-workers 20% of an 8-hour work day at a satisfactory level
* Plaintiff could deal with the public 0% of an 8-hour work day at a satisfactory level
* Plaintiff could use judgment 30% of an 8-hour work day at a satisfactory level
* Plaintiff could interact with supervisor(s) 60% of an 8-hour work day at a satisfactory level
* Plaintiff could deal with ordinary work stresses 20% of an 8-hour work day at a satisfactory level
* Plaintiff could function independently 60% of an 8-hour work day at a satisfactory level
* Plaintiff could maintain attention or concentration for 50% of an 8-hour work day at a satisfactory level

[R. 449.] Dr. Loring indicated these limitations were supported by Plaintiff's emotional volatility, poor stress tolerance, poor coping skills, and poor social skills. [*Id.*]

With respect to his ability to make performance adjustments, Dr. Loring opined that

_____

[9]A GAF score of 40 indicates

> [s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

DSM–IV–TR, *supra*, at 34.

* Plaintiff could understand, remember and carry out complex job instruction 90% of an 8-hour work day at a satisfactory level
* Plaintiff could understand, remember, and carry out detailed, but not complex, job instructions 90% of an 8-hour work day at a satisfactory level
* Plaintiff could understand, remember, and carry out simple job instructions 100% of an 8-hour work day at a satisfactory level

[*Id.*]  Dr. Loring indicated Plaintiff seemed intellectually bright and his mental status, cognition-wise, was intact.  [*Id.*]

With respect to his ability to make personal-social adjustments, Dr. Loring opined

* Plaintiff could maintain personal appearance 80% of an 8-hour work day at a satisfactory level
* Plaintiff could behave in an emotionally stable manner 20% of an 8-hour work day at a satisfactory level
* Plaintiff could relate predictably in social situations 20% of an 8-hour work day at a satisfactory level
* Plaintiff could demonstrate reliability 10% of an 8-hour work day at a satisfactory level

[R. 450.]  These limitations are based on Plaintiff's MMPI results and his multiple hospitalizations.  [*Id.*]  Dr. Loring also opined Plaintiff would have difficulty working at adequate pace with persistence due to emotional volatility.  [*Id.*]  Should he receive an award of benefits, Dr. Loring opined Plaintiff should probably receive some supervision due to his history of alcohol abuse.  [*Id.*]  Dr. Loring opined Plaintiff's limitations have existed at this level of severity since his first hospitalization in 2006.  [*Id.*]

### ALJ's Treatment of Dr. Loring's Opinion

The ALJ discussed the weight assigned to Dr. Loring's opinion, explaining

> I have given full consideration to the opinion of Dr. Loring that the claimant is considerably more impaired by his mental impairments (Ex.B19F).  I do not find his opinion, based upon his one-time evaluation of the claimant, to be adequately supported by the minimal abnormal clinical findings of record or the other substantial, credible evidence of record. I note Dr. Loring gave no specific scores for any of the tests he allegedly

26

> administered to the claimant. I have relied more heavily on the treating records and the opinion of the state agency medical consultants, which I find to be consistent with the progress reports of the mental health center where he is treated, the report of his primary care provider that his mental limitations are slight, the reports of the Department of Vocational Rehabilitation that he was interested in learning Spanish and computer programming, and the claimant's description of his level of activity and social functioning including playing tennis (which he denied at the hearing) and teaching Bible school (Ex. B1F, B3F, B4F, B5F, B10F, BI2F, BI5F, BI7F).

[R. 22.]

### *Discussion*

A review of the ALJ's decision shows that the ALJ evaluated Dr. Loring's opinions in

accordance with 20 C.F.R. §§ 404.1527 and 416.92, and that he adequately indicated and

explained the weight he assigned to this opinion based on a the medical records as a whole.

The ALJ explained that

> The claimant testified that he is nervous and depressed and has anxiety attacks.  The medical evidence shows that he is followed for major depression and a personality disorder at Union Mental Health Center.  Progress notes from his psychiatrist at Union Mental Health Center, Alvin J. Ratzlaff, M.D., and his psychotherapist show that he was depressed and angry in July 2009, shortly after his first denial of disability benefits.  Dr. Ratzlaff added Abilify to his medications regimen and assessed him as having a GAF of 60 (Ex. B1F, p. 4, 24). In October 2009, Dr. Ratzlaff reported that his depression was resistant to treatment but that he seemed less despondent.  His GAF remained 60 (Ex. B1F).  In January 2010, Dr. Ratzlaff reported that he was doing "quite a bit better" and that his GAF had improved to 65 (Ex. B1OF).  Dr. Ratzlaff reported that the claimant was more depressed in April 2010 but had been off his anti-depressant medication for two months (Ex. B2F).

> At the time he applied for benefits in May 2010, the field office representative reported that the claimant had problems with coherency, concentration, talking, and answering.  The representative reported that he was quiet, stared at the ground

or table during most of the interview, and had a disheveled appearance (Ex. B2E).

His counselor reported in July 2010 that he had made some progress in social activity and had made a friend with whom he attended church (Ex. B10F, p. 8). His primary care provider, Thomas F. Bradberry, M.D., reported that his mental limitations were slight in September 2010 (Ex. B5F).

The consultative examiner, Gordon Early, M.D., reported on October 5, 2010, that the claimant's Zung score showed severe depression but that he looked only mildly depressed. (Ex. B6F). Dr. Ratzlaff reported on October 20, 2010, that he was doing well and that his GAF had improved to 70 (Ex. B10F, p. 5). His counselor reported that was still attending church and enjoyed it once he got there. He reported having a good relationship with his Sunday school teacher and attending church and family dinners (Ex. BI0F, p. 7). Dr. Ratzlaff reported in January 2011 that he had no clinical abnormalities, other than his usual flat affect, and a GAF 60 (Ex. B.10F, p. 3).

In April 2011, Dr. Ratzlaff reported no significant change in the claimant's condition. The claimant was more depressed in August 2011 and reported having suicidal ideation. Dr. Ratzlaff put him on a higher dosage of Abilify and reported significant improvement the following week with a return of his GAF to 60. Progress reports from his counselor in November 2011 show that he had taught Bible school and helped his friend with deer stands (Ex. B12F). Dr. Ratzlaff reported that he was doing much better on the increased dose of Abilify and was not as depressed as he had been. His GAF improved to 65 (Ex. 17F, p. 13). Dr. Bradberry reported in February 2012 that he appeared calm and stable (Ex.B13F, p. 4). In March 2012, he reported having difficulty being around people but had resumed going to church and had also planted some vegetables (Ex. BI7F, p. 12). Dr. Ratzlaff noted no clinical abnormalities and assessed him as having a GAF of 65 (Ex. B17F, p. 10).

The claimant was admitted to the hospital in April 2012 for recurrent suicidal ideation. By the time of discharge, his GAF had improved to 60 (Ex. B16F). The claimant reported in May and June 2012 that he was trying to be more active, had helped a friend repair a tractor, occasionally taught Sunday school as a substitute, and read his Sunday school lessons (Ex. B17, p. 5, 6). Dr. Ratzlaff reported in June 2012 that he had been

placed on new medications during the hospitalization.  Despite the fact that he had not taken them in weeks, he looked the best he ever had, was almost cheerful, had no clinical abnormalities, and had a GAF of 65 (Ex. B17F, p. 3, 4).

Caleb Loring, Psy.D., saw the claimant for an examination at the attorney's request in September 2012.  The claimant was alert and oriented and reported that his medications were helping him and that he was not thinking about harming himself at that time.  Dr. Loring reported that his insight and judgment appeared to be fair but that his history suggested that his judgment could be variable at times due to suicidal ideation.  Dr. Loring reported that Mr. Lindler tended to overreact to even minor stress and was functioning at a very low level of efficiency.  He reported that it seemed as though, if Mr. Lindler were placed in a stressful situation, the issue of suicidal ideation could arise for him again.   Dr. Loring diagnosed a major depressive disorder, recurrent and severe without psychotic features; anxiety disorder; and alcohol abuse, in remission per the claimant's report.  He assessed Mr. Lindler as having a GAF of 35 (Ex. B18F).

[W]ith regard to activities of daily living, Mr. Lindler told Dr. Loring that he used to have a driver's license but had lost it due to a charge of driving under the influence.  He reported that he could do indoor and outdoor chores, prepare simple meals, take care of his personal hygiene, cut grass, and shop.  He reported he had difficulty managing money on his own, but was capable of doing it.  He reported that he routinely got up around 4 a.m., drank coffee, fell asleep after about two hours, and then got up again and watched television.  He reported that he was usually around his home most of the day and went to bed around midnight or 1:00 a.m.   He reported that on Sundays and Wednesdays, he interacted with people from his church.

. . .

At the time of the reconsideration determination in March 2011, he reported that he lived alone, could take care of himself but neglected to do so, prepared sandwiches and microwaved meals, did all the chores when he felt like it, had not driven since 2004, and shopped for food.  He reported that he had no money, that his sister paid his bills, but that he was capable of handling bank accounts.   He reported that he occasionally

29

fished and hunted and went to church once or twice a week (Ex. B9E).

He reported at the time he applied for benefits that he did household chores, did laundry, and mowed grass with a riding lawn mower (Ex. B4E). He also reported at the time he applied for benefits that he read off and on during the day, went grocery shopping about once a month, and could follow written instructions (Ex. B3E).

Craig Horn, Ph.D., the state agency mental consultant at the initial level, and Richard Waranch, Ph.D., the state agency mental consultant at the reconsideration level, found that the claimant has mild restriction in activities of daily living (Ex. B8A, B7F). After considering all of the evidence from a longitudinal standpoint, I am in agreement with their assessments.

In the area of social functioning, the claimant testified that he goes to church two times a month on Wednesdays and does not want to be around a large group of people. He reported that he has problems with going to church and misses at least half the time. He testified that his difficulties are not as bad once he gets to church. He reported that he goes to church with a friend on Sunday, sometimes, and goes to his friend's house and eats dinner. He testified that he does no visiting with his family but that his mother calls him.

Dr. Loring reported that Mr. Lindler's personal relationships are characterized by lack of basic social skills. Dr. Loring was of the opinion that due to his odd presentation and personality characteristics, it would be best for him to work at a job with limited public contact. Dr. Loring also thought that Mr. Lindler would probably have a significantly difficult time even working with supervisors or co-workers in a vocational setting (Ex. B18F).

In a disability report dated March 2011, the claimant reported that he has problems getting along with others but has no problem with authority figures (Ex. B9E). His sister reported that he has limitations in all aspects of social functioning (Ex. B11E). He previously reported at the time he applied for benefits that he went grocery shopping about once a month (Ex.B3E).

His counselor at the mental health center reported that he has a friend, attends church, and occasionally teaches Sunday school lessons (Ex. B17F, p. 5, 6). Dr. Ratzlaff has not noted any consistent abnormalities, other than a flat affect, and reported at the time he was last seen that he was improved and "almost cheerful" (Ex. B17F, p. 3, 4). Dr. Hom and Dr. Waranch found that the claimant has moderate restriction in social functioning (Ex. B8A, B7F). After considering all of the evidence from a longitudinal standpoint, I am in agreement with their assessments.

In the area of concentration, persistence, and pace, the claimant reported having problems with memory and concentration, completing tasks, and understanding and following instructions in March 2011 (Ex. B9E). His sister reported that he has limitations in all aspects of this area (Ex. B11E). When seen by Dr. Loring, he was able to quickly complete the serial 7's task and to recall two out of three unrelated words after a brief delay. Dr. Loring was of the opinion that the claimant's psychological state of mind would make it difficult for him to work at an adequate pace with persistence in a full-time vocational setting. He reported that the claimant would have a difficult time complying with a schedule of set vacation and break times in a typical workday, would probably require more time off, and would probably have frequent absences from work (Ex. B18F).

The claimant previously reported at the time he applied for benefits that he read off and on during the day and could follow written instructions (Ex.B3E). He reported to the consultative examiner, Dr. Early, that he had taken a computer programming course during the previous year. His counselor at the mental health center reported that he reads his Sunday school lessons and occasionally teaches them (Ex. B17F, p. 5, 6).

Dr. Horn and Dr. Waranch found that the claimant has moderate restriction in concentration, persistence, and pace (Ex. B8A, B7F). After considering all of the evidence from a longitudinal standpoint, I am in agreement with their assessments.

As for episodes of decompensation, the claimant had experienced no episodes of decompensation of extended duration at the time of the reconsideration determination (Ex. B8A, B7F). Since that time, he has been hospitalized on one occasion in April 2012.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied. I have also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria of Sections 12.04 or 12.06. There is no evidence that the claimant needs a highly supportive environment, that a minimal increase in mental demands or change in the environment would be predicted to cause decompensation, or that he is completely unable to function independently outside the area of his own home.

[R. 16–20.]

Here, Plaintiff appears to seek to have the Court reweigh the evidence already considered by the ALJ; such an exercise, however, is contrary to law. *Mastro*, 270 F.3d at 176. The ALJ determined that Plaintiff's testimony was not credible with respect to the persistence, intensity, and limiting effects of his symptoms. [R. 22.] Further, the ALJ explained that Dr. Loring was only provided medical records through January 2011; however, Plaintiff's medical records between January 2011 and April 2012, the time Plaintiff was hospitalized, showed Plaintiff was much better on increased doses of Abilify and was not as depressed. [R. 17.] In February 2012, Dr. Bradberry reported Plaintiff appeared calm and stable. [*Id.*] After his hospitalization in April 2012, medical records show Plaintiff "reported in May and June 2012 that he was trying to be more active, had helped a friend repair a tractor, occasionally taught Sunday school as a substitute, and read his Sunday school lessons." [*Id.*] In June 2012, Dr. Ratzlaff reported that Plaintiff "had been placed on new medications during the hospitalization" and, "[d]espite the fact that he had not taken them in weeks, he looked the best he ever had, was almost cheerful, had no clinical abnormalities, and had a GAF of 65." [*Id.*] Accordingly, the Court does not find the ALJ

32

improperly weighed Dr. Loring's opinion or that his reasoning was illogical or contrary to law.[10]

Plaintiff's argument that the ALJ improperly relied on other physicians' conclusions that were irrelevant because they were based on medical records prior to Plaintiff's critical worsening lacks merit because the ALJ considered medical records after Plaintiff's critical worsening and found the opinions reliable.  [R. 17–18.]

Plaintiff takes issue with the fact that the ALJ mentioned Dr. Loring had examined Plaintiff one time and had failed to provide test results from the MMPI-II; however, the record makes clear that the ALJ's decision to give limited weight to Dr. Loring's opinion was not based solely on these factors.  The ALJ's decision reflects his consideration of the full range of evidence including evidence of Plaintiff's complaints to providers, his daily activities, the efficacy of his medication, and his testimony.  The ALJ also found Plaintiff's own description of his level of activity and social functioning to be consistent with the assessed RFC.  [R. 21–22.] Moreover, upon review of the record and the ALJ's decision, the Court finds Plaintiff has failed to demonstrate the ALJ did not consider the record as a whole or that his decision is otherwise unsupported.  Therefore, remand is not warranted on this issue.[11]  Accordingly, the Court finds the ALJ's decision is supported by substantial evidence.

_____

[10]To the extent Plaintiff suggests his hospitalization in April 2012 was representative of his condition for a 12-month period of time surrounding that hospitalization, the Court finds his assertion is not supported by the record.

[11]With respect to Plaintiff's argument that the ALJ improperly considered Plaintiff's activities of daily living, the Court finds such consideration is proper under the regulations and, again, was not the sole basis for the ALJ's decision to give Dr. Loring's opinion limited weight.  [*See* R. 21–22, *see also* 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i) (stating a claimant's daily activities is one factor the ALJ will consider when evaluating a claimant's symptoms).]

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the Court recommends that the Commissioner's decision be AFFIRMED.

IT IS SO RECOMMENDED.

S/Jacquelyn D. Austin
United States Magistrate Judge

February 9, 2015
Greenville, South Carolina